**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**EILEEN N. SHAFFER, CHAPTER 7**                                    **PLAINTIFF**
**TRUSTEE for the BANKRUPTCY**
**ESTATE OF DEBTORS DANNY AND**
**JUDY HALL**


**V.**                                   **CIVIL ACTION NO. 3:15-CV-304-HTW-LGI**

**PRIORITYONE BANK, and JOHN DOES**
**1 through 10**                                             **DEFENDANTS**

---

**ORDER**

---

### I.    INTRODUCTION

This lawsuit, filed on April 24, 2015, by the Chapter 7 Bankruptcy Trustee, Eileen N. Shaffer ("Plaintiff" or "Shaffer") on behalf of the Bankruptcy Estates of Danny and July Hall ("the Halls"), names as Defendants PriorityOne Bank ("the Bank") and John Does 1 through 10. [Docket no. 1].   At the core of Shaffer's Complaint are eighteen (18) loans that the Halls obtained from the Bank, all of which loans were collateralized by real and personal property owned by the Halls.  Following the Halls' declaration of bankruptcy, the Bank foreclosed on the collateral property.  Shaffer filed the present lawsuit, urging this court to find that the property foreclosures resulted in a surplus for the Bank.  The Bank, on the other hand, stated that, after the foreclosures, a deficiency still exists.

During the execution of the loans, the parties entered into valid and binding arbitration agreements covering each of the Bank's eighteen (18) loans (collectively, "Arbitration Agreement").  The Arbitration Agreement accompanying each loan states:

> Any dispute resulting from or arising out of the Loan, or any aspect of the relationship between the parties, howsoever such relationship may be based, shall be resolved by submission to binding arbitration under the applicable rules of the American Arbitration Association (the "Rules") as they may from time to time exist. The arbitration shall be conducted at the place designated by the arbitrator(s) which shall be as close as practicable to Magee, Mississippi. The decision and award, if any, of the arbitrator(s), which shall be in writing shall be final and binding and may be entered as a judgment in any state or federal court having jurisdiction. The arbitrator's award may in no case include an amount for punitive damages, and no combination of claimants shall be allowed to participate in the arbitration as a class or through any type of class action.

 [*See* Docket nos. 6-1 through 6-18].

The Arbitration Agreement further states, in bold capitalized letters:

> THE PARTIES UNDERSTAND THAT THIS AN AGREEMENT AMONG THEM TO SETTLE DISPUTES BY BINDING ARBITRATION, REPLACING THE RIGHT TO HAVE SUCH MATTERS DETERMINED BY A COURT, EITHER WITH OR WITHOUT A JURY, AND WAIVING ANY RIGHTS TO PUNITIVE DAMAGES OR CLASS ACTIONS.

[*See* Docket nos. 6-1 through 6-18].

On November 2, 2015, this court stayed all proceedings in this matter and compelled the parties to arbitration under the Arbitration Agreement between the parties.  [Docket no. 12]. The arbitration proceedings took place pursuant to the rules of the American Arbitration Association ("AAA")[1]. The arbitrator, John Corlew ("the Arbitrator"), conducted an evidentiary arbitration hearing and, on October 29, 2019, entered an award in favor of the Plaintiff, Trustee Shaffer.

Shortly thereafter, on November 20, 2019, Defendant PriorityOne Bank ("the Bank") moved AAA to disqualify the Arbitrator and vacate, or modify, his award.  The Bank claimed that the Arbitrator and the Bank, prior to the arbitration, had been parties to a disqualifying pre-existing financial relationship that the Arbitrator had failed to disclose.  This relationship, accuses the Bank, violated the Arbitrator's duty of impartiality to the parties. The Bank

---

[1] The American Arbitration Association (AAA) is a not-for-profit organization with offices throughout the U.S. AAA provides services in the field of alternative dispute resolution to individuals and organizations who wish to resolve conflicts out of court. *See* http://www.ad.org/mission (last visited Apr. 9, 2021).

concludes that the AAA should appoint a new arbitrator to conduct a new hearing on the merits of this dispute.

The AAA, however, dismissed the Bank's petition, explaining that it was not the proper forum for the Bank's objection. This is so, said the AAA, because its jurisdiction ends when an arbitrator renders his or her decision (or until another terminating event takes place)[2].

Thereafter, the parties filed their respective motions for relief before this court. The jurisdictional grant for this appellant process is found in Title 9 U.S.C. § 9[3], Title 9 U.S.C. § 10[4], and Title 9 U.S.C. § 11[5]

---

[2] "Inasmuch as the award in this matter has been issued, the AAA is not the proper forum for this objection." [Docket no. 43-17, p. 1].

[3] If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court. 9 U.S.C.A. § 9 (West).

[4] **(a)** In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
**(1)** where the award was procured by corruption, fraud, or undue means;
**(2)** where there was evident partiality or corruption in the arbitrators, or either of them;
**(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
**(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
9 U.S.C.A. § 10 (West)

[5] In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration--
**(a)** Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
**(b)** Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
**(c)** Where the award is imperfect in matter of form not affecting the merits of the controversy.

By way of her motion, the Plaintiff, asks this court to confirm the Arbitrator's award and enter a Final Judgment in Plaintiff's favor [Docket no. 37]. The Bank, on the other hand, petitions this court to set aside or modify the arbitration award based on the Arbitrator's material conflict of interest. [Docket nos. 43 and 52].   The Bank further argues that this court should set aside or modify the award because the Arbitrator failed to apply appropriate Mississippi state law when he applied foreclosure procedure.   In addition, the Bank contends the Arbitrator miscalculated the award; therefore, says the Bank, even if this court declines to vacate the award, this court should modify the award to reflect the Bank's calculations.

 Plaintiff denies the existence of any disqualifying conflict of interest between the Arbitrator and the Bank.  The Arbitrator's Opinion and Award, continues the Plaintiff, is based upon sound Mississippi legal precedent and reflects the appropriate calculation figures.

This court's decision addresses only the issue whether the Arbitrator had a material conflict of interest, which potentially could have affected his ability to render an impartial award. A finding of such a disqualifying conflict, in the absence of waiver, would render the second issue, concerning the legal merits of the Arbitrator's award, moot.

To obtain a comprehensive account of the Arbitrator's alleged history with the Bank and his involvement in this matter, this court held oral arguments on September 16, 2020, and October 22, 2020. The scope of these hearing was narrowed to two issues: (1) whether a material disqualifying conflict of interest existed between the Arbitrator and the Bank; and, if so, (2) whether the Bank waived its right to assert the conflict as grounds for vacatur or modification of the arbitration award.  This court now discusses its finding, as follows.

---

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.
9 U.S.C.A. § 11 (West).

## II.   PERTINENT BACKGROUND

Between March 15, 2007 and June 30, 2011, the Bank extended eighteen separate loans to the Halls, either individually, or for entities solely owned/operated by the Halls. [Docket no. 1, ¶ 7 and Docket nos. 1-1 through 1-18].   As stated *supra*, this court ordered the parties to arbitration in accordance with the previously executed Arbitration Agreement between the parties.  This court, however, in obeyance to Mississippi law, struck the punitive damages waiver from the Arbitration Agreement.  *See Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507, 523 (Miss. 2005) (overturned on other grounds by *Covenant Health & Rehab of Picayune, L.P. v. Estate of Moulds*, 14 So. 30 695 (Miss. 2009); *Trinity Mission of Clinton, LLC. v. Barber*, 988 So. 2d 910, 924 (Miss. Ct. App. 2007) (acknowledging that the Mississippi Supreme Court has found waiver of a punitive damage clause in arbitration agreements to be unconscionable).

On February 14, 2017, counsel for the Bank informed the AAA that "the parties have agreed on an arbitrator… [and] his name is John Corlew…]. [Docket no. 72-3].  At the time that the named John Corlew was being considered for selection as the arbitrator in this dispute, he was a guarantor on a loan with the Bank. [Docket no. 52-12, p. 4]. Specifically, the Bank had extended to McInnis & Broadway, LLC, a commercial property developer in Hattiesburg, Mississippi in 2013, a loan in the principal amount of $709,441.56 ("the Loan").  The Loan was secured by a deed of trust on the developer/borrower's commercial property. [Docket no. 52-12, p. 4]. The Arbitrator, in 2013, was a member of McInnis & Broadway, LLC, and, as a member, he executed a personal guaranty of the Loan. [Docket no. 52-11, p. 6].   The Bank, thereafter, twice renewed the Loan: in May 2016, before the Arbitrator was appointed in the dispute *sub judice*; and in July 2017, after the Arbitrator had been appointed in this matter. [Docket no. 52-12, pp. 10-23].

On February 27, 2017, following his selection as Arbitrator by the parties herein, the Arbitrator delivered his disclosures in the underlying Arbitration Proceeding. [Docket no. 52-16]. The Arbitrator did not disclose his outstanding loan guarantee to the Bank. *Id.*

> The Arbitrator's Notice of Appointment, which governs the content of disclosures, states:
>
> It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. This is a continuing obligation throughout your service on the case and should any additional direct or indirect contact arise during the course of the arbitration or if there is any change at any time in the biographical information that you have provided to the AAA, it must also be disclosed. Any doubts should be resolved in favor of disclosure. [Docket no. 52-11 at p.1].

The Arbitrator answered "no" to the following questions, as shown below:
> 4. Have you had any professional or social relationship with any parties or witnesses identified to date in this proceeding or the entities for which they work?
>
> No.
>
> 7. Are there any connections, direct or indirect, with any of the case participants that have not been covered by the above questions?
>
> No.

[Docket no. 52 at pp. 1-2].

The Arbitrator concluded his disclosures by stating that he "ha[d] conducted a check for conflicts and ha[d] nothing to disclose." [Docket no. 52-11 at p. 3]. The Arbitrator further acknowledged that his "obligation to check for conflicts and make disclosures is ongoing for the length of [his] service as an arbitrator in this matter, and that [his failure] to make appropriate and timely disclosures may result in [his] removal as arbitrator from the case…." [Docket no. 52-11 at p. 5].

The Arbitrator also executed an "Arbitrator's Oath", attesting under oath that he had "performed [his] obligations and duties to disclose in accordance with the Rules of the American Arbitration Association, Code of Ethics for Commercial Arbitrators and/or all applicable statues pertaining to arbitrator disclosures." [Docket no. 52-11 at p. 3]. The Arbitrator's oath attested that he understood his "obligation to check for conflicts and make disclosures [was] ongoing for the length of [his] service," and that he would follow the "Code of Ethics, and the rules of the American Arbitration Association…" [Docket no. 52-11 at p.3], the contents of which the Arbitrator testified  he had fully reviewed  [Docket no. 106, pp. 31-33].

On or about July 7, 2017, the parties entered into an agreement, whereby McInnis & Broadway, LLC agreed, among other things, to pay ten percent (10%) down on the principal balance by the maturity date or term out the loan. [Docket no. 52-12, p.24]. In July 2018, when the McInnis & Broadway Loan matured, the outstanding debt totaled approximately $679,000.000. [Docket no. 52, ¶8]. This agreement was signed by the Arbitrator John Corlew, McInnis & Broadway, LLC member Joel W. Ingram, and the Bank's senior loan officer, Bruce K. Calcote. [Docket no. 52-12, pp. 24-25].   McInnis & Broadway, LLC refinanced the loan with another financial institution, and then satisfied its debt to the Bank on August 20, 2018 [Docket no. 52, ¶. 8].

The Arbitrator rendered his Arbitration Opinion and Award in the dispute *sub judice* on October 29, 2019. [Docket no. 37-1].  The Arbitrator found that the Plaintiff was entitled to the total amount of $2,711,813.33. [Docket no. 37-1, p. 12]. The Award accounted for "Surplus" from the foreclosed properties in the amount of $1,081,813.33 and "Wrongfully foreclosed properties" in the amount of $1,630,000.00. [Docket no. 37-1, p. 12].

During the hearings conducted on September 16, 2020, and October 22, 2020, this court heard testimony from the Arbitrator, as well as from the Bank's representatives.  Ordinarily, a district court called upon to either confirm or vacate an arbitration award would not call the arbitrator as a witness in the matter; however, here, there is a difference of opinion as to what the facts actually show concerning an alleged conflict. This court determined that the Arbitrator's testimony was paramount to the issue at hand because there may exist some explanation regarding the Arbitrator's disclosures, which had not yet been brought forth by the parties.

This court invited the parties to respond with any legal objections to the Arbitrator being called as a witness.  Upon service of the Bank's Notice of Intent to serve Arbitrator Corlew with a subpoena[6], Plaintiff Shaffer objected to any testimony from the Arbitrator until this court first resolved the issue of the Bank's waiver.  Plaintiff further objected to the scope of the subpoena as too broad.

This court, having considered the Plaintiff's objections, advised the parties that during the course of the telephonic hearing, the court would limit its scope to whether the Arbitrator's award should be vacated based on an alleged conflict of interest between the Arbitrator and the Bank, and, then, whether the Bank has waived his right to assert any such conflict.

The Bank's witnesses present live at the hearings included Robert Barnes ("Barnes"), the Bank's President and Chief Executive Officer ("CEO") during the time of the underlying arbitration. [Docket no. 105, p. 6, lines 18-22], and Chester White ("White"), the Bank's Chief

---

[6] PriortityOne Bank served upon Plaintiff a "Subpoena to Testify at a Deposition in a Civil Action" [Docket no. 82-1] and a "Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action." [Docket no. 81-1].  The Bank's subpoena duces tecum includes a list of communications and documents related to the Abritrator's relationship with Plaintiff Shaffer, her attorney, C. Victor Welsh, III, and the AAA.  The Bank's Notice of Intent to Serve and full list of requested documents has been made part of the record as Docket nos. 81 and 81-1]

Lending Officer, Executive Vice-President, and arbitration representative. [Docket no. 105, p. 7, lines 1-3].

The Arbitrator (also testifying live at the hearing) stated that he "never had the first thought that [he] had any relationship with PriorityOne Bank from Mcgee [sic], Mississippi, or any PriorityOne Bank for that matter." [Docket no. 106, p. 26, lines 18-20.  He further stated that he would have disclosed the guaranty "[h]ad it come to [his] mind that this guaranty was out there…" [Docket n. 106. p. 43, line 9].

The Bank, through its 30(b)(6) witnesses, testified that the McInnis and Broadway, LLC Loan documents were kept in its files and systems in the regular course of business and were available for search prior to the Arbitrator's selection in February 2017. [Docket no.105, p. 18, lines 2-3]. The Bank further asserted that these loan documents contain eleven (11) references to "John Corlew".  [Docket no. 105, p. 20, lines 13-15].

The Bank contends that it "first became aware of the McInnis & Broadway Loan after the [arbitration] Award in October 2019." [Docket no. 105, p. 22, lines 17-20].  During the October 22, 2020 hearing, CEO Barnes further denied any involvement, direct as well as indirect, with the McInnis and Broadway, LLC Loan. [Docket no. 105, p. 23].

This court, however, notes that an internal email chain produced by the Bank shows that Barnes and White, as members of the Bank's loan committee[7], had reviewed the McInnis Broadway Loan in July 2017, approximately five (5) months after John Corlew was selected as the arbitrator. [Docket no.112-8].

---

[7] White testified that he and Barnes were members of either a "loan committee" or "executive committee" which reviewed loans. [Docket no. 105, p. 85, lines 2-5].

The email chain referenced includes messages from loan officer Bruce Calcote to McInnis & Broadway, LLC member Joel Ingram, and to Barnes and White. The relevant contents of the email chain, [Docket no. 112-8] are reproduced, as follows:

- Bruce Calcote to Joel Ingram on May 8, 2017:

  *Joel, in our conversations, I had failed to mention that we are going to need tax returns and updated financial for McInnis and Broadway as well as you and Mr. Corlew. Willie[8] seems to be leaning toward 5% principal reduction or $4,000 a month for 12 months. Thanks, Bruce.*

- Joel Ingram to Bruce Calcote on May 10, 2017:

  *Thanks, Bruce. I'll start getting the financials together. I'm not sure if we can handle those terms but I hope we can find a way forward. Joel.*

- Bruce Calcote to Joel Ingram on May 15, 2017:

  *Joel, if you cannot do that, what do you propose? Bruce.*

- Joel Ingram to Bruce Calcote on May 18, 2017:

  *Hello Bruce, attached are the 2016 tax return from M&B and HUB Development. I'll ask Mr. Corlew to send his as well. With the $4,000 per month payments, will any portion of that reduce principal or is it all interest? Thanks, Joel.*

The emails next reflect several messages between Joel Ingram and Bruce Calcote regarding the specifics of the Loan and receipt of arbitrator John Corlew's tax documents.  On Friday, July 7, 2017, Bruce Calcote sent his correspondence with Joel Ingram to White, Barnes, and another PriorityOne Bank employee, Raland Bruce, stating the following:

  *I want to apologize for the confusion on this credit. It was my understanding from Willie or I thought that the committee was made aware of what we were doing on this credit. Below is an email which pretty much sums up history on this credit this year. I had originally made Willie aware that they had not paid anything down in two years on principal. I went to Joel and told him basically, what you put on credit review sheet, Pay 10% down or put on monthly payments. He said they did not have the cash to pay $67,000 down and could not afford putting on payments. After discussing this with Willie, we came up with paying $4,000 a month and in twelve months they would have to pay*

---

[8] The parties do not identify "Willie" in their submissions or testimony to this court. This court assumes Bruce Calcote is referring to a senior PriorityOne loan officer.

*105 down or put on monthly payments. As always, I will do whatever you recommend, just wanted to make sure you knew the entire story. Thanks. Bruce.*

[See Docket no. 112-8].

Later the same day, on July 7, 2017, White responded to Bruce Calcote, attaching Barnes and Raland Bruce to his email. His response stated:

*Bruce, after our discussions regarding this credit, it appears that we have already committed ourselves to the $4,000 per month payment. Since we are in that position at this point we need to carry forward with it. However, as I told you, we will need to put in writing to them that in 12 months we will be looking for a minimum reduction in principal and we will place on an amortized bases [sic]. Chester White.*

[See Docket no. 112-8].

Barnes and White testified that the email chain was either not attached to Bruce Calcote's July 7, 2017, email, or "if it was, Barnes and White did not review those emails, thus failing to recognize the name "John Corlew" in the messages. [Docket no. 105, p. 7- 13-17]. The Bank contends that it realized John Corlew, the guarantor, was the same individual as John Corlew, the arbitrator when the Arbitrator issued his award. According to the Bank, the Arbitrator's Award was first emailed on October 31, 2019, to Barnes, who, in turn, emailed it to White. [Docket no. 105, p. 9, lines 9-21]. The Award, contends Barnes, was so "ridiculous," "egregious," "illogical" and "contrary to what foreclosure law is," that the Bank undertook a "thorough search of [its] records" and discovered, for the first time, that the Arbitrator had been a guarantor of a loan with the Bank. [Docket no. 105, p. 13, lines 3-11].

The Bank, thus, denies that it knew all along of its conflict with the Arbitrator, John Corlew, and further denies that it held on to this information until the Arbitrator rendered a decision adverse to the Bank's interests. Plaintiff Shaffer, on the other hand, argues the Bank did have knowledge of the alleged disqualified interest, and that it strategically chose to withhold its objection until the Arbitrator rendered his adverse award.

## III.    ANALYSIS

### A.  Arbitration

This court first notes that judicial review of an arbitration award is extraordinarily narrow. *Antine v. Prudential Bache Sec., Inc.* 899 F.2d 410, 413 (5th Cir. 1990). The Court of Appeals for the Fifth Circuit has held that review of arbitration awards is limited in order "to give deference to the decisions of the arbitrator." *21st Fin. Servs., LLC v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014).

Under the terms of the Arbitration Agreement, the Bank and the Halls contracted for a "final and binding" Arbitration Award. "The decision and award, if any, of the arbitrator(s), which shall be in writing, shall be *final and binding* and *may be entered as a judgment* in any state or federal court having jurisdiction (emphasis added)."  The purpose of the Federal Arbitration Act ("FAA") is "to give arbitration agreements the same force and effect as other contracts . . ." *Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004). Accordingly, judicial review is exceedingly deferential to the decision of the arbitrator. *Apache Bohai Corp. LDC v. Texaco China BV*, 480 F.3d 397, 401 (5th Cir. 2002) (judicial review intended to reinforce strong deference due arbitration tribunal).

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 10 *et seq*., however, authorizes courts to vacate arbitration awards in four circumstances:

(1)  where the award was procured by corruption, fraud, or undue means;

(2)  where there was evident partiality or corruption in the arbitrators, or either of them;

(3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Light-Age Inc., v. Ashford-Smith*, 922 F.3d 320, 322-323 (5th Cir. 2019)(citing *Dealer Computer*

*Services, Inc. v. Michael Motor Co., Inc.*, 485 Fed. Appx. 724, 728 (5th Cir. 2012)(unpublished)[9]

(quoting 9 U.S.C. § 10(a)).

### B.  Failure to Disclose Potential Conflict of Interest

Under the FAA, an arbitration award should be vacated "where there [is] evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). The AAA rules require arbitrators to file a "Notice of Appointment" form disclosing "any past or present relationship with the parties or their counsel, direct or indirect, whether financial, professional, social or of any other kind."[10]. The United States Supreme Court, therefore, has held that an arbitrator's failure to disclose a material relationship with one of the parties can constitute "evident partiality" requiring vacatur of the award. *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

The Court in *Commonwealth Coatings*. reasoned that, along with concerns about the appearance of bias that may result from such nondisclosure, the arbitration process would be best served by requiring early disclosure of any significant dealings between arbitrators and parties. *Id.* at 151, 89 S.Ct. 337 (White, J., concurring). "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality," explained the Court, and stated further that "a policy of early disclosure would limit the opportunities for "a suspicious or disgruntled party [to] seize on [an undisclosed relationship] as a pretext for invalidating the award." *Id.*  The Court of

---

[9] The Fifth Circuit in *Light-Age Incorporated* explained that an unpolished opinion issued after January 1, 1996, is not controlling precedent, but the Court may consider the opinion as persuasive authority (internal citations omitted). This court also notes that both parties cite to the referenced unpublished opinion in their memorandum briefs.

[10] See Footnote 1, website citation for AAA rules and regulations. As stated *supra*, the Arbitrator in the case *sub judice* filed his Notice of Appointment on February 27, 2017.

Appeals for the Fifth Circuit similarly has held that although mere failure to disclose information is not enough to vacate an award on its own, it is certainly relevant to determining whether evident partiality exists. *Amestar v. Nordstorm, Inc*. 442 Fed. Appx. 967, 970 (5th Cir. 2011) (unpublished).

The Fifth Circuit has set out the test for "evident partiality" in the non-disclosure case of *Positive Software Solutions, Inc. v. New Century Mortgage Corp*., 476 F.3d 278 (5th Cir. 2007 (en banc)).  In *Positive Software*, the Court held that an arbitrator's non-disclosure must involve a "reasonable impression of bias" stemming from "a significant compromising connection to the parties" in order to warrant vacatur of an arbitration award under § 10 (a)(2). *Id* at 283.  The standard constituting a reasonably impression of bias requires "a concrete, non-speculative impression of bias" amounting to more than a trivial or insubstantial relationship between the parties. *Id* at 281.

The Bank *sub judice* contends that the "evident partiality" standard under § 10(a)(2) is here implicated because the Arbitrator failed to make complete disclosures prior to the arbitration proceedings. The Arbitrator testified that he would have disclosed his relationship, i.e. the personal guaranty on his Loan, "[h]ad it come to [his] mind that this guaranty was out there…" [Docket no. 106, p. 43, line 9] but, significantly, from the time he guaranteed the Loan until the Loan was transferred out of the Bank, the Arbitrator personally wrote and signed checks to the Bank for approximately $2000 each month. [Docket no. 106. pp. 38, 39, 44, and 49]. The Arbitrator conceded that the most recent outstanding loan balance of approximately $700,000 was, in his opinion, a significant amount. [Docket no. 106. p. 43, lines 20-21]. This court further notes that a mere five (5) months after his appointment, the Arbitrator executed the July 7, 2017, letter with Bank, which set the final terms for the Loan. [Docket no. 52-12, pp. 24-25].

The Arbitrator failed to disclose his financial relationship with the Bank at any time prior to, during, or after the arbitration proceeding.  The Arbitrator's disclosure forms stated that he had no conflicts with the parties, and that upon checking for potential conflicts, he "had nothing to disclose."

Upon acknowledging the existence of his loan with the Bank, the Arbitrator testified that his financial relationship with the Bank "would have [had] no impact on [his] neutrality, independence, or impartiality." [Docket no. 106, p. 32, line 7-9].  This court, however, notes that the Arbitrator's relationship with the Bank involved a significant debt on a loan, which remains outstanding with another financial lender.  This creditor/debtor relationship between the Bank and the Arbitrator is similar to the relationship between the Bank and the Halls (and therefore between the Bank and the Chapter 7 Trustee Shaffer).

The Arbitrator had personally guaranteed a significant loan to the Bank, which became due while he was serving as arbitrator in the subject case. The correspondence between the Bank and McInnis & Broadway, LLC shows that the Bank, after renewing the loan twice, required substantial payments towards satisfying the loan, in July 2017.  The Arbitrator, as a member of McInnis & Broadway, LLC refinanced the loan with a different financial institution.  The Bank contends that had the loan not been refinanced, the Bank could have foreclosed on its collateral and sought any deficiency against the Arbitrator. The Bank contends that, in the event of a foreclosure, the Arbitrator would have been in a similar position as the Halls.  This similar position, says the Bank, would lead an objective, reasonably person to determine that the Arbitrator may have been partial to the Plaintiff.

This court, upon reviewing the record before it, finds that the Bank has met its burden of showing "evident partiality".  As illustrated by the Arbitrator's testimony, a significant

connection existed between the Arbitrator and the Bank.  This court finds that the Arbitrator's failure to disclose that connection creates a "reasonable impression of bias", amounting to a material disqualifying conflict of interest in this matter.

### C.  Waiver of Conflict

Having found that a material conflict of interest exists between the Arbitrator and the Bank, this court now turns to the issue of whether the Bank has waived its right to object to the Arbitrator's conflict by failing to object in a timely manner.  The Bank contends that it was not aware of the disqualifying conflict until *after* entry of the Award and, that it did not object earlier to the Arbitrator's appointment because the Bank relied upon the Arbitrator's disclosures and representations as proof of no possible conflict.

Federal law holds that where a party has knowledge of facts indicating bias or partiality on the part of an arbitrator, such party cannot remain silent, object after receiving an adverse award, and expect to have the award vacated. *Dealer Computer Servs. v. Michael Motor Co.*, 485 Fed. App'x 724, 728 n. 4 (5th Cir. 2012) (regardless of arbitrator's non-disclosures, party with knowledge of bias must object during proceedings). The court also held that the parties have a reasonable duty to investigate for a potential conflict/relationship before the arbitrator is selected. *Id*.

Additionally, federal law holds that motions to disqualify should be denied where the complaining party could have learned of the relationship "just as easily before or during the arbitration, rather than after it lost the case." *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 28 (2nd Cir. 2004) (cited favorably in *Dealer Computer Servs.*, 485 Fed. Appx. at 728, fn.4). *See also Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir. 1987)  In *Bernstein Seawell*, the arbitrator failed to disclose a direct financial interest in one of the parties'

businesses on which he had received commissions. 813 F.2d at 732.  The Fifth Circuit held that the appellant, Bosarge, had an obligation to make his objection to the selection of this arbitrator at the time of the hearing.  By not doing so, said the Court, Bosarge had waived his right to challenge the selection after the arbitration panel's award.  *Id.*

Notably, the AAA rules also strongly encourage early investigations and objections. The rules state, as follows: "A party may challenge any arbitrator whenever circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence. A party wishing to challenge an arbitrator shall send notice of the challenge to the administrator within 15 days after being notified of the appointment of the arbitrator or within 15 days after the circumstances giving rise to the challenge become known to that party." § 41:41. United States—AAA International Dispute Resolution Procedures (Including Mediation and Arbitration Rules), Transnational Litigation § 41:41.  Article 15 further states that "[a] party who knows that any provision of the rules or requirement under the rules has not been complied with, but proceeds with the arbitration without promptly stating an objection in writing thereto, shall be deemed to have waived the right to object."

The Bank contends that, although a party must generally object before the award is rendered, this rule only applies if the party had knowledge of the circumstances that form the basis of the objection.  Because the arbitrator failed to disclose his relationship, says the Bank, it had no actual knowledge of the underlying conflict.

Federal Circuits are split as to whether a complaining party must have had actual knowledge of the underlying conflict before waiving its right to assert the conflict. The United States Court of Appeals for the Sixth Circuit, for example, follows the rule that waiver applies only if the party knew of the facts suggesting party bias during the proceedings. *See Apperson v.*

*Fleet Carrier Corp.*, 879 F.2d 1344 , 1359 (6th Cir. 1989) (applying waiver only "if all the facts now argued as to the alleged bias were known…at the time the arbitrator heard [the]grievances.") (internal citations omitted)).

Other Circuits, such as the Eighth Circuit, apply the constructive-knowledge standard, finding waiver where a party "did not have full knowledge of all the relationships to which they now object, [but] they did have concerns about [the arbitrator's] impartiality and yet chose to have her remain on the panel rather than spend time and money investigating further until losing the arbitration." *Kiernan v. Piper Jaffray Cos.,* 137 F.3d 588, 593 (8th Cir.1998), cited by *Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 148 (3d Cir. 2015).

Constructive knowledge is defined as the "[k]knowledge that one using reasonable care or diligence should have, and therefore [such knowledge] is attributed by law to a given person."[11]  The Third Circuit explained that "[t]he rationale for applying constructive knowledge in the arbitration context makes good sense [because]…it both encourages parties to conduct adequate due diligence prior to the issuance of the award and protects the arbitration goals of efficiency and finality." *Goldman, Sachs & Co* 803 F.3d 144 at 149.

The Court of Appeals for the Fifth Circuit, following the constructive-knowledge standard, has held that a party waives its right to object based on an alleged conflict of interest if it had constructive knowledge of the conflict. *Light-Age Inc., v. Ashford-Smith*, 922 F.3d 320, 322-323 (5th Cir. 2019).

The Court in *Light-Age Inc.*, 922 F.3d 320, specifically found that "a party to an arbitration waives an objection to an arbitrator's conflict of interest if the party has **constructive** knowledge of the conflict at the time of the arbitration hearing but fails to object." *Id.* at 322-323 (5th Cir. 2019) (emphasis added).  In *Light-Age Inc.*, the plaintiff petitioned the United States

---

[11] Black's Law Dictionary (11th ed., 2019).

District Court for the Southern District of Texas to vacate an arbitrator's award in favor of the defendant, arguing that the arbitration panel was improperly constituted.  Specifically, the plaintiff objected to an arbitrator's designation as "nonlawyer arbitrator" because although the arbitrator was not a lawyer, she was employed as a full-time payroll manager by a law firm. The district court for the Southern District of Texas disagreed with plaintiff and confirmed the arbitrator's award.

The Fifth Circuit confirmed the district court's decision, finding that although the plaintiff allegedly lacked actual knowledge, the plaintiff had constructive knowledge that the arbitrator worked for a law firm at the time of the arbitration hearing. The Court reasoned that the plaintiff "could have discovered that [the named employer] was a law firm simply by clicking on the link provided in [the arbitrator's] email signature or running a brief internet search." *Light-Age, Inc*, 922 F.3d 320 at 323.  "It is reasonable," explained the Court, "to expect even a pro se litigant to conduct such basic research into its arbitrator." *Id*.  The Court held that plaintiff, Light-Age, therefore had waived its objection to the arbitrator's participation on the panel because it had failed to object at the time of the arbitration hearing.

Similarly, in *Dealer Computer Servs.*, the Court found the parties had constructive notice because the information forming the basis of the alleged conflict, i.e. the arbitrator's undisclosed participation in a prior similar arbitration, was available for view on the AAA Webfile system. 485 Fed. Appx. 724 *at* 728.

In the case sub *judice*, the Bank's own records were sufficient to put the Bank on notice of a potential conflict even in the absence of the Arbitrator's disclosures. The Bank had constructive knowledge that John Corlew had an outstanding loan with the Bank at the time of

the arbitration hearing; it could have discovered this disqualifying conduct by conducting a brief search of its own client files.

The Bank did not conduct a search of its files, and made no effort to investigate, stating instead: "We do not investigate potential arbitrators." [Docket no. 106, p. 90, lines 3-4]. CEO Barnes's testimony reflected that the Bank did not even make the effort to "type the words John Corlew" into a search box and "hit enter" [Docket no. 106, p. 90, lines 3-4].

This court finds that, along with constructive knowledge, the Bank possessed actual notice of the disqualifying conflict with the Arbitrator.  Pursuant to the internal email chain, [Docket no. 112-8], both CEO Barnes and Chief Lending Officer, Chester White had reviewed the Arbitrator's loan approximately five (5) months after Arbitrator Corlew's selection. Along with references to "John Corlew" in the emails, the parties testified that the loan documents themselves contained at least eleven (11) references to "John Corlew".  [Docket no. 105, p. 20, lines 13-15]. Notably, it was the Bank's attorney, not Plaintiff's counsel, who sent correspondence to AAA confirming the arbitrator's selection by stating, "the parties have agreed on an arbitrator… [and] his name is John Corlew…]. [Docket no. 72-3].

The Bank had an unquestionable duty to conduct a reasonable investigation whether Arbitrator John Corlew manifested any disqualifying features.   Arbitrator John Corlew's financial records within the Bank's own records systems were readily accessible, available, and sufficient to put the Bank on notice. This court thus finds, as it must, that Plaintiff has demonstrated that the Bank had actual and/or constructive knowledge that the Arbitrator was a guarantor on a loan with the Bank, sufficient to waive the Bank's claim of evident partiality under § 10(a)(2).

## IV.    CONCLUSION

This court, therefore, finds that the Arbitrator, John Corlew, had a material disqualifying conflict to warrant vacatur of his award under 9 U.S.C. § 10(a). This court, however, finds that Defendant PriorityOne Bank has waived its right to object to the Arbitrator's award based on this conflict, because it failed to raise the objection in a timely manner. Accordingly, this court cannot vacate the Arbitrator's award on the basis of evident partiality.

This court next must resolve the interrogatory whether the arbitrator's award is subject to vacatur or modification under applicable Mississippi foreclosure law. This court shall enter a separate Order regarding its findings on this issue.

SO ORDERED, this the 10th day of June, 2021.


/s/HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE